<u>NOT FOR PUBLICATION</u>

**FILED**

JAMES J. WALDRON, CLERK

[March 2, 2012]

U.S. BANKRUPTCY COURT
CAMDEN, N.J
BY: <u>/s/ Kathleen Ryan</u>, Deputy

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                                    :
IN RE:                                          :
                                                    :
DANIEL W. ALLEN, SR.,               :         CHAPTER 7
                                                    :
                             Debtor.        :         CASE NO. 11-37671 (GMB)
                                                    :
_____ :         <u>MEMORANDUM OPINION</u>


<u>APPEARANCES</u>

Albert A. Ciardi, III, Esquire
Jennifer Cranston, Esquire
Ciardi, Ciardi & Astin
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA  19103
Counsel for the Debtor

Scott J. Friedman, Esquire
Dilworth Paxson LLP
LibertyView – Suite 700
457 Haddonfield Road
Cherry Hill, NJ  08002
Counsel for Advanced Telecommunication Network, Inc.
          and
Roberta Colton, Esquire
Jason H. Baruch, Esquire
Trenam Kemker
101 E. Kennedy Boulevard
Suite 2700
Tampa, FL  33602
Counsel for Advanced Telecommunication Network, Inc.

John P. Leon, Esquire
Subranni Zauber, LLC
1624 Pacific Avenue
Atlantic City, NJ  08401
Counsel for the Chapter 7 Trustee

I.    **INTRODUCTION**

Before the Court is the Motion of Advanced Telecommunications Network, Inc., ("ATN") for an

Order (1) Determining the Inapplicability of the Automatic Stay; or in the alternative (2) Granting Relief

from the Automatic Stay and Waiving the 14-Day Stay of Effectiveness of Order (the "Motion for

Relief").

A hearing was held on the Motion for Relief and the Motion to Limit ATN's participation in the

Debtor's Rule 2004 examination on December 6, 2011 and it was determined by the Court that further

briefing would be necessary in order to make a ruling on ATN's Motion for Relief.[1]  The Court noted at

the hearing that resolution of the Motion for Relief would require this Court to resolve the issue of

whether the Property[2] is solely ATN's estate property or interest, and/or whether the Debtor has an

interest in the Property.

In order to address these complex issues of law, a detailed factual backdrop is essential going

forward.  After a chronologically detailed account of the parties' somewhat tortured history, this Court

will address the legal issues necessary to resolve the Motion for Relief.  First, this Court will determine

whether the Property held in the Cook Islands Fund is Property of the ATN Estate[3].  This question must

necessarily be resolved at the outset because if the answer is in the affirmative, then the remaining issues

may very well be rendered moot.  If, however, ATN merely holds a claim against the Debtor for the

---

[1] The parties were able to resolve the Debtor's Motion to Limit ATN's participation in the Debtor's Rule 2004 Exam.

[2] Any capitalized terms will be defined below and are used in the introductory paragraphs of the Opinion solely for the sake of convenience.

[3] The term "Property" refers to the funds held in the Cook Islands Trust Accounts, namely the Shingle Oak Family Trust and the Southern Breeze Trust, if any.  While the term "Property" is used throughout this Memorandum, such use of the term is not meant to reflect this Court's determination of whether or not any such funds actually remain in the Cook Islands Trust Accounts.  Moreover, there are inconsistencies, to say the least, in the account of when certain monies were transferred from Daniel Allen to the Shingle Oak Trust and then subsequently to the Cook Islands.  As noted more fully below, at least one court has found that between August 28, 2003 and October 2, 2003 the Allens had liquidated all of their stock accounts in the United States and wired at least $2.2 million to two self-settled offshore trusts."  See In re Advanced Telecommunications Network, Inc.,, 2011 Bankr. LEXIS 3069 (Bankr.M.D.Fla. July 28, 2011).  However, the documents pertaining to the Cook Islands Trusts show that they were formed in or around 1999, after the 1999 Settlement Agreement but before the commencement of any litigation by ATN against the Allens.

amount of money which ATN seeks to collect from the Property *res*, among other assets, the Court must next address the Debtor's interest in said Property, if any.  At that point, the Court will consider §541, as it applies in to ATN's argument regarding its superior interest in the Property pursuant to §541(d) and the imposition of an equitable constructive trust.

II.    **BACKGROUND AND FACTS**

Daniel Allen (the "Debtor" or "Allen" or "Daniel Allen") and Gary Carpenter ("Carpenter") co-founded Advanced Telecommunications Network, Inc. ("ATN"), in 1989.  ATN is generally known as a "long distance re-seller" in its industry.  ATN purchased long distance telephone service in bulk from larger carriers and then resold the services to customers, both commercial and residential.  Many similar start-up companies entered this industry in the early 1990's, with very few surviving.[4]  From 1989 to 1996, Daniel Allen held the title of either president or vice-president and owned 50% of the voting stock of ATN.  Carpenter also held the titles of either president or vice-president of ATN from 1989 through October 2000.  Carpenter was also a director and owner of the remaining 50% of ATN's voting stock. David Allen, Daniel Allen's brother, and Robert Carpenter, Carpenter's father, owned the balance of the ATN non-voting stock.

For several years, both Allen and Carpenter worked together running ATN.  However, in or around April of 1996, disputes arose between Allen and Carpenter which eventually resulted in Carpenter, then president of ATN, placing Allen on administrative leave and effectively denying him access to ATN's business offices or financial information.  During this "lock-out" period, ATN continue to pay Allen his salary until August 1996 when Carpenter delivered to Allen a letter of termination effective at the close of business on August 14, 1996.

_____

[4] As noted in the February 18, 2005 Opinion rendered in the litigation captained In re Advanced Telecommunication Network Inc., v. Daniel Allen and David Allen, (In re Advanced Telecommunication Network, Inc.), 321 B.R. 308 (Bankr.M.D.Fla. 2005) (the "2005 Judgment"), in 1996 ATN was one of hundreds of long distance companies reselling long distance telephone services.  By 1999, ATN was one of only three remaining resellers of AT&T long distance services.

Shareholder Litigation

As a result of this infighting, Allen initiated litigation against ATN and Carpenter in the state

courts of New Jersey (the "Shareholder Litigation").  The complaint filed by Allen in the Shareholder

Litigation contained thirteen counts against both Carpenter and ATN, raising numerous issues, including

control over the company, reimbursement of attorney fees incurred by Allen in connection with the

Shareholder Litigation and the forced sale of Allen's ATN stock.  Due to the deadlock in ATN's

management caused by the Shareholder Litigation between Allen and Carpenter, the New Jersey state

court appointed a third director to ATN who also assisted in helping the company obtain financing to

remain in operation.

Shareholder Litigation Settlement

The Shareholder Litigation went to trial in December 1998, with ATN and Carpenter each

represented by separate counsel.  On December 23, 1998, the parties[5] settled the case, with attorneys for

the Allens and Carpenter each signing a very short handwritten settlement agreement that provided for,

*inter alia*: $1.25 million to the Allens' Attorneys; $6.25 to the Allens in two installations, Jan. 1999

($250k) and June 1999 ($6 million), and; a stipulation of dismissal with prejudice upon execution.   ATN

was also required to forgive all debts due by the Allens to ATN, which then totaled approximately $1.6

million, and advance any funds needed by the Allens to pay for any tax liability arising from their

ownership of ATN stock.  The parties believed that they had reached a total, global settlement and the

ongoing trial was stopped.

A formal written agreement was drafted and signed by the parties on January 12, 1999 which

included all of the terms outlined in the earlier handwritten agreement (the "1999 Settlement

Agreement").  As will be discussed more fully below, the Eleventh Circuit held that ATN's legal

---

[5] David P. Allen was made a party to the Shareholder Litigation as a non-voting stock holder.  Thus, where the
plural "Allens" is used in the context of the Shareholder Litigation, both David P. and Daniel Allen are being
referred to herein.

obligation to the Allens was actually incurred when Carpenter and Allen signed the 1999 Settlement

Agreement in their individual capacities and on the company's behalf on January 12, 1999, and not when

the parties first signed the handwritten agreement on December 23, 1998.   Immediately after the 1999

Settlement Agreement was signed, ATN paid $1,250,000 to the Allens' Attorneys and paid them an

additional $100,000 in later installments.  ATN also paid the Allens $250,000 on Jan. 12, 1999 and

additional $6 million on June 1, 1999 (the "$6 million transfer") pursuant to the agreement.  The money

was transferred directly from ATN's accounts to the Allens' account and never passed through any

individual account owned by Carpenter.  Sometime after the transfers were made, they were

recharacterized in ATN's books as "loans" to Carpenter, who then signed promissory notes which

recharacterized the transfers as purchases of the Allens' stock from ATN by Carpenter.

### ATN-WATS Litigation

Prior to the institution of the Shareholder Litigation, ATN was also having difficulties with a

competitor known as WATS/800, Inc. ('WATS").  In 1995, a contract dispute erupted and WATS filed a

$39 million claim against ATN which was still pending at the time the Shareholder Litigation was settled

and the $6 million transfer occurred (the "ATN/WATS Litigation").  Daniel Freeman ("Freeman") was

the then-president and owner of WATS.[6]  ATN and WATS settled their dispute on October 19, 2000 with

the parties agreeing, *inter alia*, that ATN would pay $10.5 million to settle all claims -- $6 million

payable to WATS and $4.5 payable to Investment Partners[7] (the "WATS Settlement") and that Carpenter

would relinquish control over ATN to entities controlled by Carpenter.  Ultimately, Carpenter, acting on

behalf of ATN, executed a promissory note payable to WATS for $5.5 million, even though ATN's

---

[6] During the pendency of the WATS/ATN litigation, WATS itself filed a chapter 7 bankruptcy petition.  One of
Freeman's other companies, WATS/800 Holdings, Inc., purchased the interest of the Chapter 7 trustee in pursuing
the WATS $39 million claim against ATN for a single payment of $10,000. Thus, WATS/800 Holdings, Inc.,
essentially stepped into the shoes of WATS for the remainder of the litigation.  Freeman remained in control of the
litigation against ATN both before and after the WATS bankruptcy.
[7] Investment Partners, LLP ("Investment Partners") also filed suit against ATN in connection with the WATS
litigation.  Investment Partners lent money to WATS and obtained a security interest in WATS customer list.  When
WATS sold that the customer list to ATN, the transaction which precipitated the litigation between ATN and
WATS, Investment Partners asserted that their collateral was improperly transferred.

agreed upon liability to WATS was $6 million.  The $500,000 reduction was attributed to ATN assigning

to WATS and Investment Partners the claims ATN held against the Allens asserted in the adversary

proceeding in ATN's bankruptcy.  In effect, WATS gave ATN a credit for the value of the allegedly

"fraudulent transfers claims asserted against the Allens in [the] litigation."  In re ATN, 321 B.R. 308

(Bankr.M.D.Fla. 2005).

At the time of the WATS Settlement it was also agreed upon that Carpenter would give Freeman

an affidavit dated October 19, 2000 declaring his negative net worth in the approximate amount of $9.5

million (the "Insolvency Affidavit").  A substantial amount of the obligation owed by Carpenter to ATN

was attributable to the promissory notes he had given to ATN under the Shareholder Litigation Settlement

with Allen.  In exchange for giving his Insolvency Affidavit to Freeman, ATN forgave the $9.5 million in

shareholder loans Carpenter owed to ATN.  In addition, Carpenter was promised a consulting contract

with annual payments of $100,000 and ATN's agreement to pay his $25,000 monthly home mortgage.[8]  It

is important to note that the Insolvency Affidavit given by Carpenter to Freeman would later be used by

ATN to conclusively establish one element of the constructive fraudulent transfer claim against Daniel

Allen, namely that ATN was insolvent at the time of the 1999 Settlement Agreement.

Also as part of the settlement of the ATN/WATS Litigation, as noted above, Carpenter

relinquished control of ATN to Telecom Holdings, LLC and RBW Holding, LLC.  These entities were

---

[8] It is interesting to note that in District Judge Trager's Concurrence of the Eleventh Circuit's Opinion discussed later herein, Judge Trager found the relationship between Freeman and ATN "quite troubling."  See In re ATN, 490 F.3d 1325, 1338.  Specifically, Judge Trager stated the following with respect to Freeman:

> Freeman, an insider, held up to 89% of ATN's debt on the bankruptcy filing, he sought to use the WATS/ATN litigation to try to recoup his losses when his own business (WATS) failed… he decided to use litigation again as a tool to save himself from his poor business judgment, this time by going after the Allens who had previously sold their interests in ATN to Carpenter….he used the WATS/ATN claim not only to gain control of ATN, but also made sure to try to protect himself by receiving a security interest in all of ATN's assets, as well as a $5.5 [million] promissory note from Carpenter, acting on behalf of ATN… The bottom line is Freeman took a business risk and lost.  He should not be allowed to use litigation as a hedge to protect himself from his calculated, and failed business judgment.  Unfortunately, this issue was never directly raised by the Allens.

Id. at 1338.

also owned and controlled by Freeman.  Freeman took control of ATN and it is presumed that he is still in control of ATN at this time.  It was stated in the Opinion of the Bankruptcy Court for the Middle District of Florida on February 18, 2005 that in October 2000, approximately eighteen (18) months after the 1999 Settlement Agreement of the Shareholder Litigation and the resultant $6 Million Transfer, that ATN was generating annual revenues of between $10 million and $15 million.  In re Advanced Telecomm. Network, Inc., 321 B.R. 308, 324 (Bankr. M.D.Fla. 2005).

ATN's Chapter 11

Freeman continued to operate ATN for almost three (3) years after the ATN/WATS Settlement and eventually concluded that ATN needed to reorganize its business under the protection of Chapter 11 of the Bankruptcy Code.  ATN filed its petition on January 10, 2003, just two days prior to expiration of the four year statute of limitations on any fraudulent transfer claim that might have resulted from the settlement of the Shareholder Litigation and the 1999 Settlement Agreement with the Allens.  On the date that ATN's bankruptcy petition was filed, ATN acknowledged non-insider secured claims of only $269,455.30 and non-insider unsecured claims of $672,235.56.  Insiders held 89% of ATN's debt on the bankruptcy filing and non-insiders held only 11%.

ATN eventually confirmed a plan of reorganization and pursuant to said plan, retained control of its assets and continued operations.  The reorganized ATN debtor retained the ability to pursue the Allens in an adversary proceeding and said case was commenced on April 28, 2003 (the "ATN /Allen Litigation").  The Debtor asserted thirteen counts in its Amended Complaint and the Allens raised two affirmative defenses and a counterclaim.  The thirteen count Amended Complaint consisted of the following counts: six fraudulent transfer claims, one count of improper distribution to shareholders, one count alleging actual fraud, conflict of interest, unjust enrichment, right to an accounting, equitable subordination, and turnover.

At first, the Honorable Arthur B. Briskman administered the bankruptcy case and related adversary proceedings, including the ATN/Allen Litigation.  ATN repeatedly sought orders forcing the Allens to sequester or to return any funds distributed to them on account of the 1999 Settlement Agreement.  ATN twice sought an *ex parte* temporary restraining order prohibiting the Allens from dissipating the funds transferred to the Allens pursuant to the 1999 Settlement Agreement while the ATN/Allen Litigation was pending.  Judge Briskman denied the initial request for an *ex parte* order and scheduled a hearing on notice to the Allens.   At the continued hearing, Judge Briskman heard substantial evidence from the Allens and eventually granted ATN's request entering a preliminary injunction prohibiting the Allens from transferring any settlement monies pending trial.  That order was entered sometime in late 2003, prior to any determination on the merits of the ATN/Allen Litigation and is presumed to have been an attempt by the Court to preserve the *status quo* pending the final outcome of the ATN/Allen Litigation.

Prior to the issuance of any injunction, however, the Allens had already transferred or spent the settlement monies.  Specifically, between August 28, 2003 and October 2, 2003, the Allens had liquidated stock accounts inside the United States and are alleged to have wired at least $2.2 million to two self-settled offshore trust accounts in the Cook Islands: the Shingle Oak Family Trust created by Daniel Allen and the Southern Breeze Trust created by David Allen (hereinafter sometimes referred to the "Cook Islands Trust/Trusts").  See In re ATN, 2011 Bankr. LEXIS 3069 (Bankr.M.D.Fla. July 28, 2011).  Judge Briskman then entered an order directing the Allens to repatriate/return the monies to the United States. The Allens did not comply with the order, for reasons each party disputes, resulting in a holding by Judge Briskman on September 4, 2004 that the Allens were in contempt of court for failing to return the monies to the United States (collectively, the "Repatriation Orders").  The case was subsequently reassigned to the Honorable Karen S. Jennemann.

After a multi-day trial, Judge Jennemann of the Bankruptcy Court for the Middle District of Florida rejected ATN's fraudulent transfer claims, finding, *inter alia*, that ATN's fraudulent transfer

claims failed as a matter of law because ATN had failed to satisfy the two elements of fraudulent transfer

under New Jersey law.  In re ATN, 321 B.R. 308 (Bankr.M.D.Fla. 2005).   Specifically, the court found

(1) that ATN was not insolvent at the time of the $6 million transfer, and (2) that ATN did not receive less

than reasonably equivalent value in return for the transfer.  Judge Jenneman rendered her opinion on

February 18, 2005 (the "2005 Judgment").  At that time, the Bankruptcy Court vacated the Repatriation

Orders previously entered by Judge Briskman, which was consistent with the ruling at the time in favor of

the Allens.

        ATN appealed the bankruptcy court's decision on the counts alleging constructive fraud and

improper shareholder distributions to the District Court of the Middle District of Florida which affirmed

the bankruptcy court in a brief opinion.  ATN timely appealed those counts to the Eleventh Circuit.  The

remaining counts consisting of fraud, conflict of interest, unjust enrichment, turnover, right to an

accounting, and equitable subordination were abandoned by ATN.  In re ATN, 490 B.R. 1325, n. 7 (11th

Cir. 2007) ("The remaining counts are abandoned, and we do not consider them here").

        During or around this time, the parties entered into a Settlement Agreement dated September 30,

2005 (the "2005 Settlement Agreement").  The Settlement Agreement provided, in pertinent part, that:

            [t]he Parties … agree that it is in their collective and respective best interest to
            conditionally cease all claims, disputes and lawsuits between them conditioned
            only upon the outcome of the Adversary Appeal through any and all levels
            thereof.

See In re ATN, 2010 U.S.Dist. LEXIS 110378 (M.D.Fla. August 31, 2010).  The events leading up to the

2005 Settlement Agreement and each parties' motivation in entering into the agreement are unknown to

this Court and the various opinions from the Bankruptcy and District Courts of the Middle District

Florida are devoid of such information.

        On September 25, 2007, the Eleventh Circuit Court of Appeals reversed the Bankruptcy Court's

final judgment, and remanded the litigation for further proceedings consistent with the appellate ruling

(the "2007 Appellate Ruling").  More specifically, the Eleventh Circuit found, inter alia, that the

Bankruptcy Court: (i) erred by failing to downwardly adjust ATN's assets according to the discounted

value of ATN's obligations to WATS in its solvency analysis; and (ii) erred in its calculation of the

"value" received in return for the disputed transfer.  In re ATN, 490 F.3d 1325 (11th Cir. 2007).  The

Eleventh Circuit stated that "[o]n remand, it is possible that the court will again conclude that the

company was solvent."  Id. at 1336.  With respect to whether ATN received reasonably equivalent value,

the Eleventh Circuit stated the following:

> It is clear from the record that ATN received nothing in return at the actual time
> of the transfer, other than the (arguable) value of the cessation of Allen and
> Carpenter's litigation… it is evident from the record that the true beneficiary of
> the dispute's resolution was Carpenter, not ATN.

Id. at 1338.  On remand, the Bankruptcy Court found the following:

> [w]ith the Appellate Court's finding that ATN received no reasonably equivalent
> value in exchange for the transfers to the Allens, combined with the universal
> conclusion that ATN had incurred debts beyond its ability to pay on a timely
> basis, this Court is required, under Section 25:2-25(b) of the New Jersey Statutes
> … [to find that the transfers] were avoidable fraudulent transfers.

In re ATN, 2009 Bankr. LEXIS 2028 (July 10, 2009).  Thus, on July 9, 2009, under the revised analysis

mandated by the 2007 Appellate Ruling, the Court entered an Amended Final Judgment in favor of ATN

and against the Allens on counts 2 and 6 of the complaint (the "2009 Amended Final Judgment" or "2009

Judgment").  The 2009 Amended Final Judgment specifically provided, *inter alia*, that

> Judgment is entered in favor of the plaintiff… and against the defendants… on Counts 2
> and 6 asserted in the Amended Complaint, in the amount of $6,250,000[9]….[t]he transfers
> made to the defendants, Daniel W. Allen and David D. Allen, are avoided…[t]he Court
> abates any further proceedings on the Counterclaim, pending the request of any party in
> interest to request a hearing on the issue…

See Amended Final Judgment, Case No. 6:03-bk-0299-KSJ, Adv. No. 6:03-ap-122, July 10, 2009.

---

[9] At oral argument and in its supporting briefs related to the ATN/Allen Litigation, ATN's attorney waived seeking
avoidance of the $250,000 transfer made on January 1999.  Consequently, a second amended final judgment was
entered avoiding only the $6 million transfer made on June 1, 1999.  See In re ATN, 2010 Bankr. LEXIS 84 *6
(Bankr.M.D.Fla. Jan. 15, 2010).

Shortly after the 2009 Amended Final Judgment was entered, the Allens filed a Motion to Vacate or, in the alternative, to Amend the 2009 Amended Final Judgment. Specifically, the Allens asked the Court to reconsider its ruling on the issue of ATN's "solvency" and the issue of "reasonably equivalent value"; or, in the alternative, to address their counterclaim and affirmative defenses they had previously asserted in their answer to the Amended Complaint. ATN filed a Motion to dismiss the Allens' counterclaim with prejudice, contending that the parties had resolved the counterclaim in the 2005 Settlement Agreement.

With respect to the Allens' request for reconsideration of the issues of solvency and reasonably equivalent value, the Court held that the Allens had already had an opportunity to persuade the Court and were not successful; thus, they would not be permitted to relitigate those issues. With respect to the affirmative defenses and counterclaim asserted by the Allens, ATN argued that the 2005 Settlement Agreement precluded such relief. The bankruptcy court held that the agreement specifically preserved the Allens' right to continue to defend the adversary appeal through any and all levels of appeal. Thus, the 2005 Settlement Agreement did not preclude the Allens from asserting their affirmative defenses. The counterclaim, however, was held to have been dismissed with prejudice because both parties had previously signed a stipulation of dismissal with prejudice, whereby they agreed that the counterclaim would be dismissed. In the January 15, 2010 memorandum opinion, the Bankruptcy Court addressed each of the Allens' affirmative defenses and held that none of them were applicable in that case. In re ATN, 2010 Bankr. LEXIS 84 (Bankr.M.D.Fla. Jan. 15, 2010).

In a subsequent appeal from the January 15, 2010 bankruptcy court ruling, heard by the District Court on August 31, 2010, the court held that the 2005 Settlement Agreement precluded the Allens from initiating another appeal of the 2009 Judgment rendered by Judge Jennemann. The District Court looked to the language of the 2005 Settlement Agreement and stated that it "limit[ed] both parties to a single appeal – the Adversary Appeal." See In re ATN, 2010 U.S.Dist. LEXIS 110378 at *11. The term "Adversary Appeal" was specifically limited to the appeal taken by ATN to the District Court's

11

affirmance of Judge Jenneman's 2005 Judgment in favor of the Allens.  Thus, the Allens were precluded from appealing further in the ATN/Allen Litigation.

After the 2009 Judgment was entered, thereby rendering ATN as the prevailing party, ATN next sought to begin proceedings supplementary to and in aid of execution pursuant to Bankruptcy Rule 7069(a)(1) in order to collect the 2009 Judgment.  Specifically, ATN requested that the Court adopt factual findings made by Judge Briskman in the Repatriation Orders which were rendered in 2003, but subsequently vacated by Judge Jennemann in 2005.  As noted above, the Repatriation Orders were entered in 2003 prior to any ruling on the merits of the case in order to maintain the *status quo*.   After the 2009 Judgment, ATN asked the Court to adopt the previous declarations made by Judge Briskman that "…both offshore trusts are void as to creditors of the Allens, such as ATN, to direct the Allens to repatriate all funds in the Shingle Oak and Southern Breeze trusts, to enjoin the Allens from further use of monies in those trusts, and to retain jurisdiction to adjudicate disputes in their on-going collection efforts."  See In re ATN, 2011 Bankr. LEXIS 3069 (Bankr. M.D. Fla. July 28, 2011).  Specifically, the Bankruptcy Court adopted the following relevant findings of fact and law:

> Daniel Allen… retains control over the Assets … in the Shingle Oak Trust.  [He] has the power and ability to repatriate Assets held in [his] respective trust[]….
>
> The Defendants have the ability to give a full accounting in this matter
>
> As to Daniel Allen, the Assets under his control were used to fund the Shingle Oak Family Trust and the Shingle Oak Family Limited Partnership
>
> Daniel Allen failed to satisfactorily explain either why his "estate planning" required the liquidation and transfer of the Assets during the pendency of th[e] case or why it required the formation of an off-shore asset protection trust in the first place.

Id. at *11.[10]  ATN also asked the Court to wholly reinstate the Repatriation Orders and to vacate the previous order vacating the Repatriation Orders.  Judge Jennemann, however, found that the previously

---

[10] While Judge Briskman's findings of fact and conclusions of law were previously aimed at both Defendants, David P. Allen and Daniel Allen, the Bankruptcy Court found that ATN was not entitled to any relief against David D. Allen because of the automatic stay which arose from his pending chapter 7 bankruptcy.  Specifically, Judge Jennemann stated that "[s]ection 362(a) of the Bankruptcy Code prohibits any collection efforts of any kind against

entered Repatriation Orders were properly vacated by her in 2005 because, at that time, the Allens had

won their case with ATN. Judge Jennemann stated that the bankruptcy court lacked the ability to

reinstitute an order whose effectiveness has lapsed and therefore would not reinstate the 2003

Repatriation Orders. The Court did, however, issue new orders directing Daniel Allen to (1) repatriate all

monies held in the Shingle Oak Trust to counsel for ATN, (2) to provide an accounting of all monies

deposited in and transferred from the Shingle Oak Trust; and (3) to otherwise immediately freeze any

other use or transfer of any monies in the Shingle Oak Trust (the "Second Repatriation Order").

ATN subsequently brought a Motion for Contempt against Allen for failure to comply with the

Second Repatriation Order on August 3, 2011 (the "Contempt Motion"). Shortly before the scheduled

hearing on the Contempt Motion, ATN was informed that the Debtor had filed his bankruptcy petition on

September 22, 2011 in the United States Bankruptcy Court for the District of New Jersey. Thus, the

Contempt Motion proceedings did not go forward.

On November 29, 2011, ATN filed the instant Motion for Relief from Stay (the "Motion for

Relief") requesting an order (a) determining that the ATN/Allen Litigation was not stayed pursuant to the

Debtor's bankruptcy filing because ATN was seeking to collect its own estate assets and not those of

Debtor; or in the alternative (b) granting ATN relief from the automatic stay to continue with the

ATN/Allen Litigation and collection of the Judgment and waiving the 14 day stay of effectiveness of

order. Daniel Allen submitted his reply to the Motion for Relief and argued that the stay was indeed

applicable, as ATN was merely seeking to collect on a judgment and that the funds, if any, were not

property of the ATN Estate. A hearing was held on December 6, 2011 at which time the Court requested

further briefing on the relevant legal issues. Each party submitted additional briefs and their respective

replies and responses.

---

him until a creditor properly obtains relief from the stay….[a]ccordingly, ATN's efforts to collect from David D.
Allen in this adversary proceeding are stayed." Id. at *12.

As noted above, this Memorandum will first address whether the Property held in the Cook Islands Trust is Property of the ATN Estate.  If, contrary to ATN's position, it merely holds a claim against the Debtor for a sum of money ATN is seeking to collect from the Property *res*, the Memorandum will then address the Debtor's interest in said Property, if any.  Finally, this Memorandum will address ATN's argument that the Property, if any, is in fact held by the Debtor in a Constructive Trust for the benefit of ATN and as a result, whether said Property is excepted from the Debtor's Estate pursuant to §541(a) and §541(d).

## III.    DISCUSSION

The filing of a bankruptcy petition operates as a stay, *inter alia*, of the "commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor … or to recover a claim against the debtor that arose before the commencement of the case," and "any act to obtain possession of property of the estate."  11 U.S.C. §362(a)(1),(3).  Accordingly, ATN's attempt to collect from the Cook Islands Trust and continuation with the Florida Court Contempt Motion would come within §362(a) if it is (1) to obtain possession of property of the Debtor's estate; or (2) to recover a claim against the Debtor.

ATN asserts that funds held in the Cook Islands Trust, if any, are property of ATN's Estate by virtue of the 2009 Judgment entered in its favor and is therefore not property of the Debtor's Estate or subject to the automatic stay.  ATN's argument rests upon the premise that the 2009 Judgment avoiding the transfer to Debtor converted the funds, wherever situated, into property of the ATN bankruptcy estate. This premise, however, has been challenged by the Debtor.

Section 541 provides in pertinent part that

> The commencement of a case under section 301, 302, or 303 of this title creates
> an estate… [s]uch an estate is comprised of all the following property, wherever
> located and by whomever held:

… all legal or equitable interests of the debtor in property as of the
commencement of the case.

11 U.S.C. §541(a).  Section 541(a)(3) also describes property of an estate as "any interest in property that

the trustee recovers" under certain enumerated statutory provisions.  11 U.S.C. §541(a)(3).

The Debtor's basic position is that the Property at issue here would not be property of ATN's

estate until ATN actually recovered the funds at issue.  ATN's position, as noted above, is that once the

Judgment was entered in its favor, the transfer was rendered void and the funds should be treated as if

they are, and always were, property of the ATN Estate.

The leading case in support of ATN's argument is In re Mortgage America Corp., 714 F.2d 1266

(5th Cir. 1983).  In that case, a creditor initiated a State Court complaint in Texas prior to the debtor's

bankruptcy filing, asserting various causes of action based on allegedly fraudulent property transfers.  The

Fifth Circuit held that the Debtor continued to have a legal or equitable interest in the property

fraudulently conveyed under §541(a)(1).  Id.  As a result, the Court concluded that the property, even in

the hands of a third party, is property of the debtor's estate.  Id.

Other courts have rejected the Mortgage America view, holding that a fraudulently conveyed

asset does not become property of the debtor's bankruptcy estate until it actually recovered by the trustee.

See, In re Colonial Realty Co., 980 F.2d 125, 131 (2d Cir. 1992); In re Fehrs, 391 B.R. 53, 71-72

(Bankr.D. Idaho 2008); In re Feringa, 376 B.R. 614, 625 n. 10 (Bankr.W.D.Mich. 2007); In re Murray,

214 B.R. 271, 278-79 (Bankr.D.Mass. 1997); In re Saunders, 101 B.R. 303 (Bankr.N.D.Fla. 1989).  For

reasons set forth more fully below, this Court finds that the majority position expressed in Colonial is the

better reasoned approach.

Again, under §541(a)(3), "property of the estate" is described as "any interest in property that the

trustee recovers" under certain enumerated Bankruptcy provisions, including 11 U.S.C. §550.  In turn,

section 550 provides that

> … to the extent a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from –
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee

11 U.S.C. §550(a)(1)-(2).  Thus, section 550 allows the trustee to recover fraudulently transferred property for the benefit of the estate to the extent that a transfer is avoided as fraudulent under either §§544 or 548.  11 U.S.C. §550.

As the Court in In re Saunders observed,

> If property that has been fraudulently transferred is included in the §541(a)(1) definition of property of the estate, then §541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions.  We think that the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.

In re Saunders, 101 Bankr. 303, 304-305 (Bankr.N.D.Fla. 1989); quoted in Colonial, 980 F.2d at 131; cf. In re McDonald Bros. Constr. Inc., 114 Bankr. 989, 997 (Bankr.N.D.Ill. 1990); In re Wagner, 353 B.R. 106 (Bankr.W.D.Pa. 2006) ("[F]or a claim to become 'property of the estate' a trustee must actually exercise her avoiding powers and make a tangible recovery of the property before it can be transformed into 'property of the estate' as envisioned by Section 541(a)(3).")

This Court adopts the analysis outlined in Colonial and other courts in this Circuit adopting its reasoning, and will hold that the constructively fraudulent transferred property does not become property of ATN's bankruptcy estate until recovered under §550 by ATN.  The reasoning of Colonial has not only been regarded as the majority position on this subject, but has also been cited approvingly by Bankruptcy Courts within this Circuit.  See In re Wagner, 353 Bankr.106 (Bankr.W.D.Pa. 2006); In re Gronczewski, 444 B.R. 526 (Bankr.E.D.Pa. 2011).  While a judicial determination has been made by the Florida Bankruptcy Court that the transfer was constructively fraudulent, no property has yet been recovered by

16

ATN pursuant to §550.  Thus, while the claim and right to proceed with recovery pursuant to §550 are property of the ATN Estate, the judgment does not in and of itself convert the Property to that belonging to ATN.

Having found that the Property is not solely an asset of ATN's Estate, the inquiry then becomes what interest, if any, the Debtor holds in the Property as of his Petition Date.  ATN argues that when the Florida Bankruptcy Court entered its Judgment on July 10, 2009, the law mandates that the transfer be treated as a "nullity [] and treated as if it never happened." See Case No.11-37671, Doc. 39, pg. 3 *citing* Bankruptcy, Epstein, Nickles & White, Vol. 2, §6-79.  ATN goes on to quote the Epstein treatise in stating that "[n]ullification essentially means that the transfer is retroactively ineffective and the transferee legally acquired nothing through it."  Id. citing Epstein, *supra*.  It follows, ATN argues, that because the 2009 Judgment avoided the transfers made pursuant to the 1999 Settlement Agreement, Daniel Allen, cannot own any interest in the funds transferred from ATN.

This Court recognizes that in certain circumstances, voiding a transfer in and of itself is a remedy in and of itself; for example when avoidance is used to defeat transfers that were subordinate to the avoided transfer under non-bankruptcy law.  The cases cited by ATN in their Supplemental Brief provide further examples.  In In re Fieler, the Bankruptcy trustee sought to avoid as a fraudulent transfer, an election by the debtor to forego a net operating loss carryback under Internal Revenue Code §172.  In re Feiler, 218 F.3d 948 (9th Cir. 2000).  Under that specific section, a taxpayer's election to forego a net operating loss carry back is irrevocable; however, the trustee argued that his strong arm powers permitted him to avoid "any transfer" of an interest of the debtor in property when made under conditions set forth in the statute as a fraudulent transfer.  Id. at 950.  The court stated that, "[o]nce avoided, the transaction is a nullity and is treated as if it never happened", and because of the specific facts of the case in Feiler, such nullification was in and of itself the desired result.  The "nullification" of the transaction, *i.e.*, the debtors' prepetition election to forego a net operating loss carryback in order to preserve and benefit from it after the bankruptcy was over, had the immediate effect of entitling the bankruptcy estate to the debtors' tax

17

refund. Under the specific facts and circumstances of the <u>Feiler</u> case, the remedy of treating the

transaction as if it had "never happened" was, in the end, the only remedy the trustee sought. <u>Id</u>.

       In another case cited by ATN, <u>In re Pearson Industries, Inc.</u>, the court had to interpret section 550

of the Code, as it applied to a trustee that had been successful in a §547 preference action against a

transferee. <u>In re Pearson Industries, Inc.</u>, 178 B.R. 753 (Bankr.C.D.Ill. 1995). Specifically, the court had

to determine whether the trustee was entitled to a monetary recovery for the value of the disposed

inventory where the recovery would, arguably, only benefit two secured creditors of the debtor and not

the "debtor's estate".[11] The court in <u>Pearson</u> determined that the starting point in its determination is to

recognize the relationship between avoidance, under specific provisions of the Code, recovery under

§550, and preservation under §551; and to this end, the court looked to the prominent <u>Epstein</u> bankruptcy

treatise:

> Congress deliberately distinguished between avoiding a transfer and recovering
> from the transferee. They are conceptually different, and each of them is
> remedially different… **[r]ecovery is a remedy that supplements the remedial
> effect of avoidance per se**.
>
> …
>
> Property or its value that is recovered pursuant to section 550(a) thereupon
> becomes property of the estate…Notice that the trustee can recover the value of
> the transferred property only "if the court so orders." The clear implication is
> that recovering the property itself is the usual remedy and that recovering its
> value is extraordinary relief.

<u>In re Pierson</u>, 178 B.R. 753 at 759-760 *citing* <u>Bankruptcy, Epstein, Nickles, & White</u>, Vol. 2 West,

starting at page 200 (footnotes omitted). The court in <u>Pierson</u> found that, while the trustee had avoided

the transfer under §547, the trustee was not entitled to recovery under §550 because any recovery the

trustee would receive would not be "for the benefit of the estate". <u>Id</u>.

---

[11] The language of §550 states that "[t]o the extent that a transfer is avoided… the trustee may recover, **for the benefit of the estate**, the property transferred, or, if the court so orders, the value of such property… " 11 U.S.C. §550. (emphasis added).

As noted in <u>Feiler</u> and <u>Pearson,</u> and the <u>Epstein</u> treatise cited therein, oftentimes nullification of the transfer at issue alone is a sufficient remedy of avoidance. <u>Epstein</u>, *supra*. However, the concept of recovery and avoidance are distinct and such distinction should not be glossed over, where, as in this case, there has been no recovery pursuant to §550 yet realized by ATN. To summarize, ATN argues that the Property is property of the ATN Estate, because once "avoided" the transfer is a nullity and therefore, the Debtor-transferee could not legally have acquired anything through said transfer. ATN is mistaken. Section 541(a)(3) of the Code specifically provides that property of the estate includes any interest in property that the trustee recovers under §550; and in turn, §550 provides that "the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from - the initial transferee…" 11 U.S.C. §§541(a)(3) and 550(a). ATN has not recovered, pursuant to §550, any of the Property at issue nor its value. While it is true that Mr. Allen is "personally accountable to the estate for the return of the property or for its value," such personal accountability in the form of an avoidance judgment does not result in the immediate cessation of his interest in the Property. <u>Epstein</u>, *supra*.

<u>Constructive Trust</u>

ATN alternatively argues that Debtor's pre-petition conduct, specifically Debtor's exercise of rights over and retention of the funds, entitles ATN to the imposition of a constructive trust[12] in ATN's favor, thereby giving ATN an equitable interest superior to that of the Debtor. Not only does ATN argue that a constructive trust should be imposed, but it also takes the position that a finding of the elements of a constructive trust are *res judicata* in this case because of previous rulings by the 11th Circuit and the Bankruptcy Court in the Middle District of Florida. The Debtor does not squarely address ATN's constructive trust argument in their Reply to ATN's Supplemental Brief, rather, the Debtor posits that

---

[12] It should be noted that ATN, for the first time, asserted its constructive trust theory in its Supplemental Brief. After the December 6, 2011 hearing this Court squarely asked each party to brief the issues of whether the Property was that of ATN's Estate or the Debtor's Estate. Despite expanding the number of issues for consideration, this Court will consider the merits of ATN's position.

whatever cash or assets are in the possession of the Debtor are solely property of the Debtor's Estate and ATN merely has a claim in the Debtor's bankruptcy case.

Before delving into the applicable state substantive law regarding the circumstances in which a constructive trust should be imposed, this Court feels it necessary to first address the interface between federal bankruptcy law and state law providing for the imposition of a constructive trust.

<u>Constructive Trusts in Bankruptcy</u>

The potentially uneasy interaction between federal and state law in this particular area results from the interplay between §541's definition of property of the estate on the one hand, and; the substantive nature of property rights under relevant state law on the other.  It is generally well-established that, in the absence of controlling Federal Bankruptcy law, the substantive nature of property rights is defined by state law.  See <u>Butner v. United States</u>, 440 U.S. 48 (1979).  It has also been widely recognized that state law, in defining property rights, may not go so far as to manipulate bankruptcy priorities.  See *e.g.*, <u>In re Quality Holstein Leasing</u>, 752 F.2d 1009 (5th Cir. 1985).  There is a reason that the constructive trust doctrine, which is a common equitable remedy available in most states, is so significant in the bankruptcy context.  This is because under §541(d), where a debtor holds only legal title and not equitable interests as of the commencement of the case, that property becomes property of the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  11 U.S.C. §541(d).  Thus, it has been held that where a constructive trust has been properly imposed under state law, §541(d) accords the beneficiary of the constructive trust the right to recover the trust property from the bankruptcy trustee or the debtor.  See, *e.g.*, <u>Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.,</u> 960 F.2d 366, 372 & n.2 (3d Cir. 1992); See also, <u>In re Quality Holstein Leasing</u>, 752 F.2d 1009 at 1012 (5th Cir. 1985); <u>In re Haber Oil.,</u> Inc., 12 F.3d 426 (5th Cir. 1994).

It has been widely recognized that the remedy of a constructive trust is a potent one, especially in

the bankruptcy context, because it essentially gives the claimant "priority over the [debtor's] unsecured

creditors" to the extent of the property subject to the trust.   See In re Haber Oil., 12 F.3d 426, 436 (5th Cir.

1994).  "Because the constructive trust doctrine can wreak havoc with the priority system ordained by the

Bankruptcy Code, bankruptcy courts are generally reluctant to 'impose constructive trusts without a

substantial reason to do so'".   Id. at 436 *citing* Neochem Corp. v. Behring International, Ins., (In re Behring

In'l, Inc.), 61 Bankr. 896, 902 (Bankr.N.D.Text. 1986).[13]

One commentator has gone so far as to say that "[a]t a minimum, only property which is subject

of a ***pre-petition*** order specifically imposing a constructive trust should be excluded from the estate or

result in a special priority for claimant."   Keach, "*The Continued Unsettled State of Constructive Trusts in*

*Bankruptcy; Of Butner, Federal Interests and the Need for Uniformity*," 103 Comm. L.J. 411, 448 (1998)

(emphasis added).  As recognized in In re Day, 443 B.R. 338 (Bankr.D.N.J. 2011) there is in fact long-

standing precedent for such a bright line test precluding post-petition imposition of constructive trusts.

Id. at 346.  Despite the pronouncement of the existence of such a bright line test, the Third Circuit has not

held that constructive trusts may not be imposed in the context of a bankruptcy case.  See Official

Committee of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys., Inc. (In

re Columbia Gas Sys., Inc.), 997 F.2d 1039 (3d Cir. 1993) (applying federal common law definition of

constructive trust, which is broader than state law, to impose constructive trust where entity acted as a

---

[13] See also Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir. 1985) (stating that "[w]e necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws."); Pemaquid Underwriting Brokerage, Inc., v. D & H Alternative Risk Solutions, Inc. (In re Pemaquid Underwriting Brokerage, Inc.), 319 B.R. 824, 844 (Bankr.D.N.J. 2005) (stating that "heavy burdens should be imposed on claimants seeking to upset ratable distribution precepts of bankruptcy …"); In re Leedy Mortgage Co., Inc., 111 B.R. 488, 494 (Bankr.E.D.Pa. 1990) ("A finding that a creditor is the beneficiary of a constructive trust and is thereby entitled to special treatment over and above the normal priority to which claimants would be assigned under the Bankruptcy Code makes bankruptcy courts justifiably wary of identifying property of debtors in bankruptcy as held in constructive trusts");  In re Sacred Heart Hospital of Norristown, 175 B.R. 543 (Bankr.E.D.Pa. 1994) *citing* In re Omegas Group, Inc., 16 F.3d 1443,(6th Cir. 1994) ([a] constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code… the equities of bankruptcy are not the equities of common law… imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.).

conduit in collecting money and forwarding it to the intended recipient); See also, In re Bake-Line Group,

LLC, 359 B.R. 566, 575-76 (Bankr. D.Del. 2007) (finding that check proceeds wrongfully deposited into

debtor's account were held in constructive trust for the payee's benefit); In re Dwek, Bankr. No. 07-

11757, 2009 Bankr. LEXIS 3011 (Bankr.D.N.J. 2009) (concluding that "the Third Circuit does not share

some of its sister Circuits [sic] view that it is inadvisable to impose constructive trusts in bankruptcy").

This Court, in accord with other Courts in this Circuit, finds that the Bankruptcy Code does not

preclude the application of constructive trust law, post-petition.  As the Third Circuit noted in Columbia

Gas ,"Congress clearly intended the exclusion [from property of the estate] created by section 541(d) to

include not only funds held in express trust, but also funds held in constructive trust. " In re Columbia

Gas, 997 F.2d at 1059.

In this case, ATN was not awarded nor did it seek the imposition of a constructive trust over the

Property pre-petition. However, as pointed out above, this Court has determined that the Bankruptcy

Code does not preclude application of constructive trust law post-petition.   In making its determination as

to whether a constructive trust should be imposed in this case, this Court will be mindful that the "greatest

caution should be exercised before bankruptcy courts enter the post-petition thicket to remediate, by

establishing in the first instance, a constructive trust."  Turning to the merits of ATN's claim, this Court

will now determine whether ATN has shown that the equitable remedy of imposition of a constructive

trust, post-petition, is appropriate under New Jersey law.

Constructive Trust Under New Jersey Law

A constructive trust is a measure through which a court of equity can prevent unjust enrichment

and compel a restoration of property to a plaintiff that "in good conscience does not belong to the

defendant."  Flanigan v. Munson, 175 N.J. 597 (2002); The Dime Savings Bank of NY v. Rietheimer,

2009 N.J. Super. Unpub. LEXIS 211 (Jan. 2, 2009) (unpublished).  Courts in New Jersey have

traditionally applied a two-part test when determining whether a constructive trust is an appropriate

22

equitable remedy, requiring proof of (1) a wrongful act, which (2) resulted in an unjust enrichment.
Flanigan, supra, 175 N.J. at 608 *citing* D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968).  While constructive
trusts have been imposed in a variety of contexts, the Supreme Court of New Jersey has expressly
"caution[ed] courts generally that a constructive trust is a powerful tool to be used only when the equities
in a given case clearly warrant it."  Id. at 611.  Thus, the suitability of imposing a constructive trust must
be established by the movant by "clear, definite, unequivocal and satisfactory evidence."  Gray v.
Bradley, 1 N.J. 102, 104 (1948).

In order to meet the first prong, the movant is required to establish a "wrongful act".  D'Ippolito
v. Castoro, 51 N.J. 584 (1968).  New Jersey courts have recognized that proof of fraud by the party upon
whom the constructive trust is imposed is no longer necessary.  See Callahan v. Callahan, 142 N.J. Super.
325, 329-30 (App. Div. 1976) (repudiating former requirement of fraud).  While fraud may still satisfy the
first prong, it is clearly not the only way in which a party can establish a "wrongful act" for the purposes
of imposition of a constructive trust.  In the context of constructive trusts, "wrongful act" has been
expansively defined to include, *inter alia*, "fraud, mistake, undue influence, or breach of a confidential
relationship which has resulted in a transfer of property."  D'Ippolito, supra, 51 N.J. at 589; see also
Thompson v. City of Atlantic City, 386 N.J. Super. 359 (App. Div. 2006), *aff'd in part and modified in
part*, 190 N.J. 359 (2007).

The Supreme Court applied the "wrongful act" predicate for a constructive trust in Flanigan,
*supra*.  There, a mother had entered into a property settlement agreement embodied in a divorce judgment
which required, among other things, that the mother name her two children as irrevocable beneficiaries in
any life insurance policies that she thereafter obtained through her employment.  Flanigan, 175 N.J. at
601.  The mother subsequently remarried and obtained two life insurance policies through her employer,
but she failed to designate her children as beneficiaries on those policies.  Id.  The mother died, and
because no beneficiary designation had been made by the decedent, the second husband was to receive
the proceeds of the life insurance by default.  Id.  The grandparents of the children in Flannigan filed suit

to prevent dissipation of the life insurance proceeds to the second husband.  Id. at 605.  The trial court

imposed a constructive trust on the proceeds, which the Supreme Court affirmed on appeal.  In its

analysis, the Supreme Court agreed with the trial judge that the mother's breach of the property settlement

agreement, in failing to name her children as beneficiaries, comprised a "wrongful act," even though her

oversight was claimed to be inadvertent.  In this regard, the court recognized that "'innocent

misstatements, or even simple mistakes' can qualify as a wrongful act in these circumstances."  Id. at 609.

The law additionally requires that the wrongful act be one that *resulted* in an unjust enrichment.

D'Ippolito, *supra*, 51 N.J. at 558. (*emphasis* added).  The Third Circuit has explained that the purpose of

the equitable remedy of a constructive trust is "to restore the plaintiff property of which he has been

unjustly deprived and to take from the defendant property the retention of which by him would result in a

corresponding unjust enrichment of the defendant."  Skretvedt v. E.I. Dupont de Nemours, 372 F.3d 193,

213 (3d Cir. 2004) (internal citations omitted).  Thus, the touchstone of the constructive trust doctrine is

unjust enrichment.  First Interregional Advisors Corp. v. Golding, 218 B.R. 722, 733 (Bankr.D.N.J. 1997)

(*citing* Black's Law Dictionary 1535 (6th ed. 1990)).

This concept can be illustrated by the following cases.  In Stewart v. Harris Structural Steel, Co.,

Inc., 198 N.J. Super. 255 (App. Div. 1984), a corporation received $275,000 from the plaintiff for the

purchase of 900 shares of common stock in that corporation.  It was subsequently determined that the

corporation lacked the authority to issue those shares and that the stock certificates issued to plaintiff were

invalid.  Under those circumstances, it was held that "[t]here cannot be the slightest doubt that it would be

unjust and unfair for [the corporation] to retain this money."  Id. at 267.  To prevent such unjust

enrichment, the appellate court sustained the trial court's imposition of a constructive trust on the

$275,000 payment, plus accrued interest.  Id. at 269-71.

In Hirsch v. Travelers Inc. Co., 134 N.J. Super. 466, 470-71 (App. Div. 1971) the court imposed a

constructive trust on certain land purchased with life insurance proceeds that had been wrongfully

diverted from its rightful beneficiaries.  The court in <u>Hirsch</u> observed that "where the recipient … is a gratuitous transferee, she holds the property subject to the equitable rights of the wronged party and a constructive trust can be impressed."  <u>Id</u>. at 471.  The court concluded that the wife who had wrongfully diverted the life insurance proceeds towards the purchase of a property took title to said property subject to the equitable interests of the plaintiffs from whom the insurance proceeds had been diverted.  <u>Id</u>.

Similarly, in <u>Flanigan</u> the Supreme Court ruled that the second husband would have been unjustly enriched by his receipt of the insurance proceeds."  <u>Flanigan</u>, supra, 175 N.J. at 609.  The court held that the late wife's property settlement agreement with her first husband unambiguously established the children's right to be listed as beneficiaries, while the insurance policies had not listed the second husband as a beneficiary.  Accordingly, the Court sustained the constructive trust to assure the children's receipt of those benefits.  <u>Id</u>.

This Court gleans from the aforementioned cases that, while the "wrongful" act might not necessarily have to be fraudulent, in bad faith, or the result of wrongdoing as that word is colloquially understood, the "wrongful act" must still be **wrong** in the sense that it leads to an **unjust** result. The two elements necessary to impose a constructive trust, cannot simply be evaluated in isolation, but rather must be viewed in conjunction with one another, with the allegedly wrongful act actually leading to an unjust enrichment.

In this case, ATN argues that the Debtor has committed no less than four "wrongful acts" for the purposes of the constructive trust analysis and that the Debtor has been "unjustly enriched" by the "wrongful acts".   In addition, ATN argues that previous determinations have been made by the Florida Bankruptcy Court, District Court, and Eleventh Circuit which are *res judicata* on both the "wrongful act" element and the "unjust enrichment" element of a constructive trust.  Accordingly, this Court will first briefly address the requirements for application of *res judicata* generally.  This Court will then address, in

tandem, the arguments ATN makes with respect to the *res judicata* effect of prior rulings and the merits of their constructive trust argument.

The doctrine of *res judicata* provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 93 (1980). As stated by the Third Circuit, three basic circumstances must exist in order for *res judicata* to apply: "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc., v. Centra, 983 F.2d 495, 504 (3d Cir. 1992). While the complications of a bankruptcy case may make the application of *res judicata* somewhat more complex than in other non-bankruptcy contexts, the doctrine is fully applicable to bankruptcy court decisions. See Katchen v. Landy, 382 U.S. 323, 334 (1996). Moreover, *res judicata* is a doctrine fully applicable to final orders issued by the bankruptcy court. See *e.g.*, NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.), 267 B.R. 46, 52-53 (Bankr.D.Del. 2001); In re Target Industries, 328 B.R. 99 (Bankr.D.N.J. 2005) (stating that "bankruptcy cases require a careful application of *res judicata*).

As the court in Target Industries noted, "[a]lthough the first two prongs of the doctrine will usually be readily apparent, the third prong, whether the present suit is based on the previous cause of action, is usually far less clear." Id. at 116. "Within the Third Circuit, a cause of action should be barred only where 'the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.'" Eastern Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 337-38 (3d Cir. 2000). In the present matter, ATN claims that previous rulings by the Eleventh Circuit and the Bankruptcy Court Middle District of Florida have conclusively established both a "wrongful act" and "unjust enrichment" for the purposes of the constructive trust analysis.

<u>Wrongful Act</u>

First, ATN claims that the Debtor committed a "wrongful act" in his acquisition of the Property because it has been conclusively held that the 1999 transfer was constructively fraudulent under New Jersey Fraudulent Transfer Statute.   While it is true that the Bankruptcy Court for the Middle District of Florida, on remand, found that the transfers were avoidable under both New Jersey Statutes 25:2-25(b)(2) and 25:2-27(a), it does not automatically follow that such a finding constitutes  a "wrongful act" for the purpose of imposition of a constructive trust.   It is necessary to look at the language of the Court's opinion if we are to determine whether the final judgment at issue is based on the same cause of action presently asserted.  With respect to the N.J.S.A. 25:2-25(b)(2) claim, the Bankruptcy Court found that

> [w]ith the Appellate Court's finding that ATN received no reasonably equivalent value in exchange for the transfers to the Allens, combined with the universal conclusion that ATN had incurred debts beyond its ability to pay on a timely basis, this Court is required, under Section 25:2-25 (b) of the New Jersey Statutes, to conclude that the transfers totaling $6,250,000 paid to the Allens on January 12 and June 1, 19999, were avoidable fraudulent transfers.

See <u>In re ATN</u>, Case No. 6:03-bk-00299-KSJ, Adv. No. 6:03-ap-122, 2009 Bankr. LEXIS 2028 (July 10, 2009)).  With respect to the claim under section 25:2-27(a), the Court held that

> …ATN was insolvent by at least $2 million on the date the Allens were paid in June 1999.…ATN made transfers of $6,250,000 to the Allens for no reasonably equivalent value and either already was insolvent or was rendered insolvent as a result of the transfers.

<u>Id</u>. at *15.  This Court is not convinced that the above referenced language goes so far as to conclusively establish for the purposes of *res judicata* that the Debtor, and not ATN, engaged in a wrongful act.  In 1999 the Debtor was the recipient of a transfer from ATN that was only later established, in 2007, to have been constructively fraudulent due to ATN's insolvency and ATN not having received reasonably equivalent value in exchange.  ATN, through Carpenter, transferred the money from ATN to the Allens in order to settle ongoing litigation disputes between them.  It was ATN, through Carpenter, that made these transfers to the Allens while it was insolvent and was unable to pay its debts as they became due.  It has

not been determined by any court that Debtor, by merely serving as the recipient of a constructively

fraudulent transfer, participated in a "wrongful act" for the purposes of a constructive trust remedy.

ATN argues that a second wrongful act was conclusively established and is *res judicata* in this

case, where the Florida Bankruptcy Court made the following findings regarding the Debtor's conduct:

> [i]f any party is to be criticized for improper behavior, it is the Allens for
> secreting assets out of the United States in anticipation of an injunction
> prohibiting them from the transfer and then failing to repatriate the assets as
> clearly directed by Judge Briskman.  The Allens were the parties acting
> contemptuously, not ATN, and certainly not the Judge.

See Doc. 39, pg. 6 citing In re Advanced Telecommunications Network Inc., Case No. 6:03-bk-0299,

Adv. No. 6:03-ap-122, 2011 Bankr. LEXIS 3069(Bankr.N.D.Fl. July 28, 2011).  ATN's argument here is

a less than candid presentation of Judge Jennemann's "holding" in the matter.  As ATN is fully aware,

Judge Jennemann was responding to an accusation made by the Debtor that Judge Briskman's *ex parte*

communications with ATN were inappropriate in the context of a preliminary injunction hearing in 2004.

Judge Jennemann stated in 2011 that

> [i]n the end, the Allens' continual harping on this one [ex parte] hearing is a red
> herring.  Neither counsel for ATN nor Judge Briskman did anything wrong.
> Every decision he made was based on notice to the Allens and after a hearing.
> Rather, if any party is to be criticized for improper behavior….(see above)

Id. at *6.  The denunciation by Judge Jennemann of the Debtors' behavior was not necessary to a

resolution of the matter before her, nor can it be characterized as a "final order" for the purposes of the

*res judicata* doctrine.  In addition, such behavior will not be held to constitute a "wrongful act" in the

context of a constructive trust remedy, where there is absolutely no evidence that such conduct resulted in

or led to any unjust result.  Thus, this Court cannot find, based upon principles of *res judicata*, that the

occurrence of a "wrongful act" by the Debtor has been conclusively determined.

In undertaking its own analysis of the "wrongful act" element, this Court is unable to conclude

that ATN has established by "clear, definite, unequivocal and satisfactory evidence" that a constructively

fraudulent transfer constitutes such a "wrongful act" for the purposes of imposition of a constructive trust

in this instance.  Gray v. Bradley, 1 N.J. 102, 104 (1948).  As noted above, this Court recognizes that a

wrongful act can be the result of "fraud, mistake, undue influence, or breach of a confidential relationship

which has resulted in a transfer of property."  D'Ippolito, supra, 51 N.J. at 589.  This Court finds,

however, that the "wrongful acts" in those cases can be distinguished from the case at hand.  In

Flannigan, the mother failed to name her children as beneficiaries of her life insurance policy which she

was required to do in the divorce decree.  The "wrongful act" of failing to name her children directly

resulted in an unjust result, namely her children being left with nothing and her second husband, by

default, receiving a windfall from her estate.  In Stewart v. Harris Structural Steel, Co., Inc., the wrongful

act was held to be the improper distribution of 900 shares of common stock; because such distribution

was void for lack of authority by the issuer, the corporation's maintenance of the purchaser's funds on

account of said distribution was directly linked to an unjust result.  198 N.J. Super. 255.  In all of the

aforementioned cases, the "act" was only deemed to be "wrongful" by those courts when they were

considered in light of the resultant unjust effect.  As noted above, the test for imposition of a constructive

trust is not strictly whether element A and element B exist, but rather whether element A results in

element B.   While this Court is not convinced that ATN has shown by clear, definite, unequivocal and

satisfactory evidence that a "wrongful act" occurred in this case; even assuming that ATN had made such

a showing, this would not end the inquiry.  The Court must also find that the alleged "wrongful act" led to

an "unjust enrichment".

Unjust Enrichment

With respect to the element of "unjust enrichment", ATN similarly argues that previous rulings

by both the Eleventh Circuit and Judge Jennemann have conclusively established this element.

To that end, ATN highlights the following language from the Eleventh Circuit: "ATN received no

reasonably equivalent value for the transfer."  In re ATN, 490 F.3d at 1336.  Similarly, Judge Jennemann

stated in the 2009 Judgment that "ATN did not receive reasonably equivalent value in exchange for the

transfers to the Allens." In re ATN, 2009 Bankr. LEXIS 2028 (Bankr.M.D.Fl. July 10, 2009).  While it has been conclusively established, as noted in the above cited language, that ATN did not receive reasonably equivalent value in exchange for the transfer, it does not necessarily follow that Debtor has been unjustly enriched as a result thereof.  While it is clear from the record that ATN received less than reasonably equivalent value in exchange, it is not clear from the record that it has been conclusively determined that the Debtor did not also give up something in exchange. Thus, this Court finds that the element of unjust enrichment has not been conclusively established by virtue of *res judicata* and will therefore undertake its own analysis of said element in making the constructive trust determination.

The Debtor was essentially "frozen out" of a business that he started with Carpenter and in an attempt to settle years of litigation, he agreed to be bought out of the company for the approximate sum of $6 million, plus certain expenses.  Debtor did not receive any other compensation from ATN after the 1999 Settlement, nor did Debtor retain any stock in ATN.  After nearly ten (10) years of growing and running the ATN business, Debtor chose to settle the litigation and walk away from ATN for a sum he presumably felt fair.  It is also important to note that ATN remained an operating company, after Debtor left, and in or around October 2000, when Freeman took over ATN, ATN was making $10 to $15 million in gross revenues per year.  Thus, while ATN did not receive reasonably equivalent value in exchange, it does not follow that the Debtor was unjustly enriched as a result.  Indeed, the Eleventh Circuit explicitly stated that "it is evident from the record that the true beneficiary of the dispute's resolution was **Carpenter**, not ATN."  In re ATN, 490 F.3d 1325, at 1338 (emphasis added).

 It is also significant to note that ATN abandoned its claim of "unjust enrichment" in the ATN/Allen Litigation.  It is likewise significant that, considering the plethora of judicial pronouncements made by the Bankruptcy Court in Florida, the District Court of Florida and the Eleventh Circuit with respect to this case, nowhere is it stated that the Debtor was "unjustly enriched" by said transfer.  The Eleventh Circuit recognized that the 1999 Settlement "[A]greement was driven entirely by Carpenter's objectives, not those of ATN" and that "the trust beneficiary of the dispute's resolution was Carpenter,

not ATN." See <u>In re ATN</u>, 490 F.3d 1325.  It was not necessary, for a resolution of ATN's constructive

fraudulent transfer claims against Debtor as transferee, that Allen be unjustly enriched.  It was merely

necessary that ATN show that it was insolvent at the time of the transfer and that ATN did not receive

reasonably equivalent value.

In its analysis with respect to receipt by ATN of reasonably equivalent value, the Eleventh Circuit

looked, not to Allen, but to Carpenter as to the amounts given to ATN in determining whether ATN had

received reasonably equivalent value.  "Even if we were to consider the value of Carpenter's shareholder

loans, however, the value of those loans would have to be deeply discounted to reflect Carpenter's

precarious financial situation at the he made them… These promises were built on sand and delivered

after the fact.  Therefore, they do not present a "reasonably equivalent value" to the $6 million transfer to

the Allens."  <u>In re ATN</u>, 490 F.3d 1337.  The Eleventh Circuit's focus on the value of Carpenter's transfer

to ATN in exchange for the transfer stems from its belief that the "true beneficiary of the dispute's

resolution was Carpenter, not ATN" and that the 1999 Settlement Agreement was "driven entirely by

Carpenter's objectives."[14]  <u>Id</u>. at 1337.

Having concluded that ATN has failed to establish that the Debtor was unjustly enriched in this

case, it follows that they have not established a 'wrongful act' for the purpose of imposition of a

constructive trust under New Jersey Law.  In each of the aforementioned cases wherein a constructive

trust was imposed upon property, an act occurred which was directly linked to some unjust result.  The

---

[14] Of course, the reality of the situation was that ATN would not look to Carpenter as a source of recovering the $6
million dollar transfer, even though it was he who benefited, at ATN's expense, from it.  The back-story was aptly
summarized by District Judge Trager in his concurring opinion, where he stated the following:

> Freeman received an affidavit from Carpenter declaring his insolvency in exchange for
> ATN's forgiveness of over $10 million in shareholder loans and over $350,000 in salary
> and mortgage payments made to Carpenter.

<u>Id</u>. at 1338.  Indeed, it was the Carpenter affidavit declaring his own insolvency that was used by ATN as a sword in
the ATN/Allen Litigation and subsequent appeal.  The Carpenter affidavit substantially established, in the eyes of
the Eleventh Circuit, that ATN was insolvent at the time of the $6 million transfer because, in reality, Carpenter had
no reasonable prospect of repaying his shareholder loans to ATN totaling over $10 million at the time of said
transfer.  Once it was established that the loans made by ATN in favor of Carpenter had no reasonable prospect of
repayment, ATN's balance sheet was substantially skewed in the negative.

mother's failure in <u>Flannigan</u> to name her children as beneficiaries would have resulted in her children

being denied death benefits which they were clearly intended to receive; the unauthorized issuance of

stock in <u>Stewart</u> would have resulted in the purchaser being required to pay for an interest he could never

have received; the mistaken distribution in <u>Hirsch</u> resulted in the rightful beneficiaries being denied life

insurance proceeds.  All of these cases illustrate the relationship between a "wrongful act" and the

resultant "unjust enrichment" that the equitable remedy of constructive trust is intended to address under

New Jersey law.  The facts of this case simply do not demonstrate that such a remedy is available in this

instance.  ATN transferred funds to the Debtor at the direction of Carpenter, and because ATN was held

to have received inadequate consideration and to have been insolvent at the time, the transfer was held to

have been constructively fraudulent as to the transferee, Daniel Allen.  The facts and circumstances of this

situation do not demonstrate that it is the type of situation that constructive trust remedies in New Jersey

are meant to address.

        As noted above, a heavy burden should be imposed on claimants, like ATN, seeking to upset

ratable distribution precepts of bankruptcy.  That burden can be carried by a claimant where there is clear

and convincing evidence shown, *e.g.*, that there is a clear and precise federal policy favoring a claimant

over general distribution (See *e.g.*, <u>Columbia Gas</u>)[15], or where resulting trust law applies and is clearly

established (See *e.g.*, <u>In re Globe Store Acquisition</u>) [16], or where identifiable and specific prepetition

judgments firmly establish rights to non-ratable distribution (See, *e.g.*, <u>In re DeLauro</u>)[17]; *sub judice*, no

foundation for an equitable remedy exists.  Notwithstanding the "broad powers of bankruptcy courts to

fashion equitable remedies", such powers "must be exercised only within the confines of the Bankruptcy

Code."  See <u>In re Haber Oil Co.</u>, Inc., 12 F.3d 426 (5th Cir. 1994) *quoting* <u>Norwest Bank Worthington v.</u>

<u>Ahlers</u>, 485 U.S. 197, 206 (1988).  Daniel Allen was the recipient of a constructively fraudulent transfer

---

[15] See <u>In re Columbia Gas Systems, Inc.</u>, 997 F.2d 1039, 1059 n.7 (3d Cir. 1993)

[16] <u>In re Globe Store Acquisition Co., Inc.</u>, 188 B.R. (Bankr. M.D.Pa. 1995)

[17] <u>In re DeLauro</u>, 207 B.R. 412 (Bankr. N.J. 1997) (where a prepetition settlement agreement provided for the transfer of real property from husband to wife that agreement was incorporated into a prepetition final judgment of divorce, and the bankruptcy court thereafter imposed a constructive trust on the undeeded realty in favor of the wife and contrary to the position of the debtor husband's trustee in bankruptcy).

in 1999, however, said legal determination was not finally determined until 2009.  In re ATN, 2009

Bankr. LEXIS 2028 (Bankr.M.D.Fla. July 10, 2009).

      It seems clear that Daniel Allen violated the Second Repatriation Order in 2010 when he failed to

repatriate any remaining funds back to the United States.   Likewise, it is true that Daniel Allen's "estate

planning" mechanism has significantly hampered ATN's ability to swiftly collect on its $6 million

judgment.  The bankruptcy reporters, however, are replete with stories of creditors, including judgment

creditors, that have seen their claims remain unsatisfied and debtors receiving something for nothing.

"[I]f that were the only standard, then every creditor in every bankruptcy estate could claim to be the

beneficiary of a constructive trust and therefore not subject to the distribution schedules outlined by the

Bankruptcy Code."  In re Day, Sr., 443 B.R. 338 (Bankr.D.N.J. 2011) *citing* In re Globe Store

Acquisition, Co., Inc., 178 B.R. 400 (Bankr.M.D.Pa. 1995).    ATN has not established that it is entitled to

the imposition of a constructive trust over Property post-petition, on account of the pre-petition debt.

**IV.**      **CONCLUSION**

      The Property at issue is not property of ATN's Estate.  The Property is property of the Debtor's

Estate, to the extent that he has an interest therein, and is not subject to a constructive trust in favor of

ATN, as ATN has not shown that the Debtor has been unjustly enriched as a result of a wrongful act.

ATN has not therefore established "cause" for relief from the automatic stay.  Based upon the foregoing

reasons, ATN's Motion for Relief is hereby DENIED.  Counsel for the Debtor shall submit an Order in

conformance with this Memorandum Opinion.

                    BY THE COURT:

                    GLORIA M. BURNS
                    United States Bankruptcy Judge

Dated:  March 2, 2012